Our fourth case this morning is Tokyo Marine Specialty Insurance Company v. Altom Transport.  Good morning. Thank you, Your Honor. May it please the Court, my name is Robert Ellworth. I'm here on behalf of the appellant Tokyo Marine Insurance Company. We're here dealing with the appeal of an outcome of cross motions for summary judgment on the duty to defend Tokyo's insured Altom Transport. The initial focus, I think, of where we need to be in this case is, frankly, let's start with the title of the policy, which is Premises Environmental Coverage with a subtitle of Environmental Liability and Remediation Expense. So the question that we're facing here is whether this environmental policy, there's no dispute about that, both parties use that word, provides Altom a defense to three underlying cases that do not allege any environmental damage, no environmental impact whatsoever, frankly, that caused their bodily injury, which, again, I don't think there's any dispute or allege to have been caused by an explosion. What's important is the coverage grant and the definitions, not the title. Well, I would agree with that, yes. But, I mean, I think our initial, and I have that, but our initial discussion does need to be the intent of the policy, and I cite several cases in my opening brief here that speak of the first step of any duty to defend analysis is to determine what the intention of the policy is. And so, again, I'm going to be a little broader and say every insuring agreement here requires contamination. Most of them, I should say with several of them mentioning migration of that contamination, right? Most of the coverage grants here, including transportation, speak of coverage to remediate environmental damage, cost to control or monitor that contamination. Even the definition of bodily injury includes, potentially, the potential for environmental monitoring claims. This is a policy designed to provide, at least in this more limited circumstances, for bodily injury that arises from contamination or is caused by contamination, and that is simply not the case here. And I think, Your Honor, you're moving on to the definitions of, well, three matters. I'd break them out into three, but contamination and then bodily injury arising out of contamination and then caused by transportation. I think that's where you were headed, so that's where I was going to. And as I point out in my brief, contamination is really, I think, the central inquiry here, and that is contamination itself is a contaminant not naturally occurring in the environment in the amounts or concentrations discovered. Now, I go straight to the end of that definition. In the amounts or concentrations discovered. Again, this speaks directly, and frankly, I can't think of another way it doesn't speak, to environmental pollution, which now we're back at the title of the policy. It's not limited to that. The definition itself is much broader than that. Well, but doesn't it always? Contamination means the discharge, dispersal, or release or escape of any contaminant into or upon land or any structure on land, the atmosphere or any water course or body of water. That's what happened here. The contaminant, the substance was released, and then it ignited and exploded. So there may be a sort of Paul's graph causation argument that you could make on the duty to indemnify and that will undoubtedly be made. It's funny that I try not to get too far because I think we end up in the circuit court, the personal injury suits and indemnity issues, and I'm trying not to go there. Right, but that's why the duty to defend always turns on whether the underlying allegations fall within the coverage grant, and that's kind of a light touch look. If it's arguably within the coverage grant, there's a duty to defend. There may not be a duty to indemnify, but that's for down the road. I understand that. The definition is very broad. I think what you read in the definition, frankly, is simply the definition of the totality of the environment, all of those different places. It could be outside. It can be inside. It can be into water. That, to me, is simply the breadth of the environment. But the fact of the matter is at the end, that contaminant still has to be in a discoverable amount or concentration for it to be contamination under the policy. Wherever it happens to be located, here we're inside a building. We're not making any argument that that, for some reason, excludes the claims from coverage. It's really about, again, whether this is contamination. Because there is no amount that's discoverable, there certainly is nothing to be remediated, given the ultimate facts of this case. And, of course, that's where we end up with the bodily injury arising from that contamination. There is no allegation anywhere that this draining of fluid caused this glob of contamination, whether it be a plume, whatever it might be, in the soil, in the property, in the water, that needs to be remediated. It's being drained into a drain. This is obviously how TAC East, I'm getting my parties right, how TAC East cleans trucks. There's always going to be some fluid left in that truck. Otherwise, we wouldn't be sending it to be, or it wouldn't be sent to be cleaned. That's inarguable, in my mind. So there's always going to be something. Obviously... Well, this wasn't a trace amount. This was... Well, I suppose if it's being sent, it's being sent. Forty gallons. Forty gallons is the allegation, yes. Something was left behind in the truck. Correct. It wasn't completely unloaded. I'm not... So that's why we're here. And when the company that was supposed to be cleaning the truck started to unload and drain this highly flammable liquid, it exploded. Well, I would phrase that differently, number one. That is a cleaning company. Everything they do is cleaning. We drop the truck off. Right. We drive away. They take possession of the tanker. Everything they do from that point forward is the process of cleaning. Does that make any difference under the terms of the policy? I believe it does if we were to jump forward to transportation, yes. Why so? How so? Because, again, the transportation and the unloading of the truck, that's really the word that we're talking about. The unloading of the truck, and this is where I argue 7th Circuit and Illinois Supreme Court law on the complete, no D, complete operations doctrine and what it means for the delivery of, in this case, Altom's truck, which is their good under the commercial contract that they have with Tac East. They are bringing a truck to be cleaned. They're not delivering isopentane. They're delivering a truck to be cleaned. It's always going to be dirty. That's the whole point of this. So focusing solely on the draining of, we can call it fuel, we can call it waste, both those fit here. And I'm saying that because the term waste is in the policy. But at the end of the day, the commercial contract that is at issue in this case is Altom's with Tac East, and that is a contract for the cleaning of the truck. Yes, so it's not unloading is what you're saying. It's not unloading. It doesn't matter how much material was left in the truck. It doesn't make any difference. That truck was half full. It still, under your definition, is not unloading. It's just cleaning. That's correct. That's correct. And I'm surprised when we look at the Merit Insurance Company case from the Illinois appellate court that described when we're talking about, if this doctrine applies, because we use it mostly in the auto, but if it applies here, when you're looking at unloading and the particular facts are it was completed but negligent, if that's the allegation, then the question that the Illinois courts have directed or the appellate courts have directed is that under those particular facts, the question we're asking is that the injury that occurred, did it occur because of the negligent way that it was unloaded, during the unloading process? Okay, there's a couple things there that I would say. Number one is that the fact of the matter, we're talking about this case under a transportation coverage grant. So obviously there's use of a vehicle. This notion that it's only limited to auto policy I think is mistaken. Secondly, if you look at the allegations of negligence in the three underlying claims, you will see that all three of the allegations that are against Altam Transport have nothing to do with the unloading of the fuel. They are all related to failure to warn. They all deal with the delivery of the truck to have it cleaned. And I think that that's where the inquiry needs to be as opposed to simply splashing liquid out in the drain is too narrow of a focus to the complete operations doctrine that this court and the Supreme Court of Illinois have adopted. I see I'm out of town. Thank you. Thank you. Mr. Is it Comfer? Yes. Okay. May it please the court. Council. My name is CJ Comfort. I represent Altam Transport Inc, a trucking company of three generations dating back to the 1940s and established right here in Chicago. One of their senior executives is with me here today in the, in the courtroom. I want to start with the issue that Tokyo advanced in regards to this being an environmental pollution only policy. You mentioned in our brief, the words environmental pollution are not in the policy itself. There's no case law that they say to that says their policy should only apply to environmental pollution. There's no definition of environmental pollution in the policy. This policy applies to contamination and contamination is a far broader concept than mere pollution. I want to take you to the definition of contaminant, which I think is instructive on this issue. The definition of contaminant includes pollutants, irritants, electromagnetic fields. I'm skipping around here. Acids, alkalis, toxic chemicals, hazardous substances. It stands to reason based on that definition of contaminant that all pollutants are contaminants, but not all contaminants are pollutants. Again, contamination is a far broader concept here. And Altam Transport bought the Tokyo Marine policy to cover contamination, broadly speaking, not limited to mere pollution. This is part of a larger policy that consisted of CGL coverages and a separate coverage for, you know, straight up auto coverage or for the trucks and the operation of the trucks themselves. Is that right? That was done under separate policy agreements. Okay. All right. So this is a standalone. I thought it, when I took a look at this in the record, it looked like this. It has other, like the coverage grant is broader than, you know, it has transportation in it, of course, and that's what we're here today is under the transportation subsection E. Right. But it looked to me like the premises environmental coverage declarations and all the terms of that part of the coverages, that was part of a larger policy. It may, I mean, as far as I know Altam had a standalone automobile policy, which we cited on the record. This is with Arch Insurance Company. So. I mean, this would typically be attached to a CGL, right? Well, that's what I'm referring to. Was it part of a CGL policy? I actually would. Well, I think it depends on the product that's sold, but a lot of CGL policies will have pollution and contamination exclusions. So you would have to buy a policy like this to, you know, because there would be gaps in coverage. Right. That's what I mean. It's a petrochemical company like Altam as it transports highly flammable liquid waste as the plaintiffs allege. Right. So this was specifically sought and needed. It was. It was. Operationally for your client's company. Exactly. Exactly. Yeah. This is paramount that they have this type of. With the transportation component of it being critically important. Right. Which is I'll move into the next argument about the complete operations doctrine as well, because I think it's important to note here that Tokyo is arguing on one hand that this is an environmental pollution only policy, a very limiting position to take and reading of the policy. And then at the same time, they're arguing that the court should look at a doctrine that's only applied in the automobile policy context. They can't have it both ways simply. And using the complete operations doctrine here would eviscerate the definition of transportation. The definition tells us when transportation ends, when all of your waste, again, I'm skipping around here. Products, materials, goods has been unloaded from the vehicle. We have no reason to inject the complete operations doctrine into this policy. And the cases that they cite to because, I mean, we were all curious about this. Does this doctrine apply? The Estes case, I believe was a 19, um, 1980, 1980. And then, and then I believe the Liberty case was older than that. I mean, there's been time here for that doctrine to work its way into other policies. If it's so applies, it hasn't done. So both the two cases they cite are in the automobile policy context and all the later cases, um, that site, those two as precedent are in the automobile policy context. Well, and this is a highly specialized policy and presumably Tokyo price, the risk when ensuring your client's company, considering the line of work entailed. So the premium that was paid for this particular set of coverages was priced knowing that your client transports flammable liquids. Right. Right. Can not only leak and cause bodily harm without exploding, but also leak and cause bodily harm by exploding. Correct. Correct. That's what highly flammable liquid materials do is they can catch on fire and explode. Um, again, Tokyo wrote the policy to your point. They had the opportunity to insert or define pollution itself. They failed to do so. I think looking at the definition of contaminant is useful here because it evidences that the concept, um, that they're trying to rely on to narrow the scope one, it's entirely inappropriate for duty to defend. Um, and that, and that analysis, but it also evidences that pollution is covered under this. It's just contamination as a far broader concept than pollution. And that's, and that's the coverage that to your point, Alton paid for that Alton sought. And again, Tokyo as the drafter had the last opportunity if it's so wanted to do so to limit its own policy. Um, when it issued the policy to Alton, unless there are further questions, I'm going to, no. Okay. Okay. Well, thank you again for the opportunity. We ask that the court affirm the district court's decision here. Thank you. Thank you. Tokyo is a duty to defend. Thank you. Mr. Elworth. I think you used all your time, but you can have an extra minute and rebuttal. So I'm not going to get into a, I don't know what language I should use here. Uh, an argument about whether the, my use in the brief on behalf of Tokyo of the word pollution is, is anything that we should be turning it on here. But again, the policy put together covers unnatural contaminant concentrations discovered in the environment. That's what the policy covers. And I that's on page seven of my reply brief is where I write that very sentence. Whether you use the word pollution or not, that pretty much is pollution unnatural contaminant concentrations discovered in the environment. And then the final thing I would say is it's interesting that his description, Alton's description of this policy, although apparently it doesn't cover pollution, is to fill the gap for the CGL pollution exclusion. So I think it does speak to what the policy's purposes. Thank you. Thank you. All right. Thanks to both. Counsel to take places taken under advisement.